UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:                                              Chapter 7

    NICOLINA RANDAZZO and            Case Nos. 05-25563 (ASH)
    PIETRO RANDAZZO,

                Debtors.

------------------------------------------------------------x

CARMELO CAMBARERI,

                Plaintiff,              Adv. Proceeding No. 06-

    -against-

NICOLINA RANDAZZO and                        **COMPLAINT**
PIETRO RANDAZZO,

                Defendants.

------------------------------------------------------------x

Carmelo Cambareri ("Mr. Cambareri" or the "Plaintiff"), by his attorney William F. Macreery, Esq., as and for his complaint against the defendants Nicolina Randazzo and Pietro Randazzo (collectively, the "Debtors" or the "Defendants") to determine that all claims owed to the Plaintiff by the Debtors are not dischargeable and that the Debtors are not entitled to a discharge, respectfully alleges as follows upon information and belief:

**PARTIES**

1.      The Plaintiff is a creditor of the Debtors in the above captioned case.

2.      The defendant Nicolina Randazzo is one of the debtors in the above captioned Chapter 7 case and resides, upon information and belief, at 32 Rome Avenue, Bedford, New York 10507.

3.      The defendant Pietro Randazzo is the other debtor in the above captioned Chapter 7 case and resides, upon information and belief, with his wife, Nicolina Randazzo, at 32 Rome Avenue, Bedford, New York 10507

## JURISDICTION AND VENUE

4.      On October 10, 2005, the Debtors filed a voluntary joint petition with this Court seeking relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") and commenced the above captioned bankruptcy case (the "Bankruptcy Case").

5.      The Plaintiff holds unsecured claims in excess of $3,000,000 against the Debtors (the "Cambareri Claims") by virtue of a series of brazen, duplicitous and unlawful forgeries and frauds committed by the Debtors, all of which share a common thread: the Defendants, through a remarkably similar recurring pattern of fraud and deception, tricked and coerced Vincenza Cambareri, who is the sister of Nicolina Randazzo and the Plaintiff's wife, into diverting and converting over three million dollars of the Plaintiff's assets as a result of a pattern of illegal behavior, consisting of the fraudulent mortgaging, re-mortgaging and, ultimately, the transferring of title to at least two pieces of real property which Vincenza Cambareri owned along with the Plaintiff, her husband, as a tenant by the entirety.

6.      The Plaintiff has brought this adversary proceeding seeking an order and judgment pursuant to Sections 523(a)(2)(A), 523(a)(4), 523(a)(6), 727(a)(2)(A), 727(a)(3), 727(a)(4)(A) and 727(a)(7) of the Bankruptcy Code, and Rules 4004, 4007, 7001(4), 7001(6) and 7001(9) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) denying the Debtors' discharge; and (b) declaring that the Cambareri Claims are not dischargeable; and (c) granting the Plaintiff such other and further relief as the Court deems just and proper.

2

7.      Jurisdiction of this Court over the instant adversary proceeding, which arises under the Bankruptcy Code in the Bankruptcy Case presently pending before this Court is conferred by 28 U.S.C. Sections 151, 157(a), 157(b)(1) and 1334, as enacted and amended by the Bankruptcy Amendments and Federal Judgeship Act, as amended.

8.      Each claim for relief set forth in this complaint is a "core proceeding" pursuant to 28 U.S.C. Sections 157(b)(2)(B), 157(b)(2)(I), 157(b)(2)(J) and 157(b)(2)(O). Consent is hereby given to the entry of a final judgment or a final order by the Bankruptcy Judge to whom this matter is assigned.

9.      Venue is proper in this Court pursuant to 28 U.S.C. Section 1409(a).

**ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF**

10.      Plaintiff, Carmelo Cambareri resides at 80 McLain Street, Bedford Corners, New York 10549, speaks English as a second language and is unable to read English with any significant degree of comprehension.

11.      Vincenza Cambareri (hereinafter "Vincenza") is the Plaintiff's wife, resides at 80 McLain Street, Bedford Corners, New York 10549, and is the sister, pawn and dupe of Defendant, Nicolina Randazzo. Vincenza speaks English as a second language and is unable to read English with any significant degree of comprehension.

12.      On or about November 22, 2004, the Plaintiff discovered, for the first time, that a series of six separate Powers of Attorney, with his signature forged on all such Powers of Attorneys, had been notarized by four separate Notaries, set forth in chronological order as follows.

| Power of Attorney | Date | Notary | Hereinafter Referred to as: |
|---|---|---|---|
| 1. | 5/13/96 | Sharon Grady | "The May '96 P of A" |
| 2. | 2/21/03 | Joseph Cambareri | "The Feb '03 P of A" |

3

| | | | |
|---|---|---|---|
| 3. | 8/21/03 | Joseph Cambareri | "The Aug '03 P of A" |
| 4. | 5/28/04 | Juan G. Lopez | "The May '04 P of A" |
| 5. | 11/4/04 | Joseph Cambareri | "The Nov 4 '04 P of A" |
| 6. | 11/5/04 | Venita Jefferson | "The Nov 5 '04 P of A" |

13.     Each and all of the forged Powers of Attorney were recorded at various and different times in the Westchester County Clerk's Office, Division of Land Records and the recordation of such forged documents constituted acts of Forgery in the Second Degree, as the same is defined in §170.10 of the Penal Law of the State of New York by the person who caused the forged Powers of Attorney to be so forged and then offered for recording and as such constituted independent tortious acts on the part of each such person who caused the forgery or caused the document to be offered for recording.

14.     The improper certification by the Notary on each of those Powers of Attorney of the signature of a person who did not appear before that Notary also constituted misconduct under §135 of the Executive Law and §330 of the Real Property Law of the State of New York and as such, each such act expressly constituted an independent tortious act on the part of that Notary and caused that Notary to be responsible to the Plaintiff for the actual damages sustained by the Plaintiff as a result of that Notary's improper conduct.

15.     Mr. Cambareri did not sign any of the above six Powers of Attorney (except the Plaintiff admits to being fraudulently induced to signing a seventh Power of Attorney, signed by him before a Notary named Dawn A. Randazzo on the 24th day of May, 2000 (the "May '00 P of A"), the use of which Power of Attorney will be discussed hereinafter) and, the aforementioned Powers of Attorney were not even signed in the presence of the Notary by the person who forged Mr. Cambareri's name.

16.     Until June 10, 2004, Mr. Cambareri and his wife, Vincenza, were the record title owners of 29 Spencer Street, Village of Mount Kisco, County of Westchester and State of New

York (hereinafter **"29 Spencer"**), 52 West Main Street in the Village of Mount Kisco, County of Westchester and State of New York (hereinafter **"52 West Main"**) and 80 McLain Street, Bedford Corners, Town of Bedford, County of Westchester and State of New York (hereinafter **"80 McLain"** or the **"Residence"**).

17.      52 West Main is a four family residential investment property acquired by the Plaintiff and his wife on October 31, 1972 and had been their marital home for a short period of time before they moved to 29 Spencer.

18.      The Plaintiff and his wife acquired title to 29 Spencer**,** a one-family residential property, on the 19th day of October, 1973 and lived there with their family until July of 1985, when they moved to the Residence at 80 McLain.

19.      80 McLain was acquired by Mr. Cambareri and his wife, Vincenza, in 1980, but the Plaintiff constructed the house at 80 McLain himself over the course of the five years from the date of its acquisition until 1985 when he and his wife and their young family physically moved in to 80 McLain.

20.      As of August 17, 1993, the only mortgage on any of the three properties owned by the Plaintiff and Vincenza was a mortgage in the approximate principal amount of $200,000 on 80 McLain**.**

21.      The first forged Power of Attorney, dated and notarized by Sharon Grady ("Grady") on May 13th, 1996, (the May '96 P of A), <u>but used prior to that date, on May 9th, 1996,</u> was recorded at Liber 393 of Powers of Attorney at page 43 in the Westchester County Clerk's Office, Division of Land Records.

22.      The address listed on the May '96 P of A for the Plaintiff and his wife, Vincenza, is 29 Spencer, an address at which Mr. Cambareri and his wife had not lived at since <u>1985</u>.

5

23.     At and or around the time of the execution of the May '96 P of A, Nicolina Randazzo devised and embarked upon a fraudulent plan, empowered and enhanced by the duping of her sister, Vincenza, which, if left uncorrected, will have succeeded in not only depleting Plaintiff's substantial equity in the three pieces of real property owned by Mr. Cambareri and his wife, but also in having caused the transfer of the title to at least two, and possibly a third, of his real properties to third parties, with no knowledge on the Plaintiff's part or any consideration being received by the Plaintiff.

24.     The first Mortgage loan fraudulently obtained by use of a forged Power of Attorney was procured by Vincenza and Nicolina Randazzo**,** by means of the May '96 P of A, with Associates Consumer Discount Company (hereinafter "Associates I") on <u>May 9, 1996</u> in the principal amount of $111,353.39 and was a first mortgage on 29 Spencer.

25.     The Associates I Mortgage was executed on May 9, 1996 by virtue of the May '96 P of A**,** dated <u>May 13, 1996</u>, signed by someone other than Carmelo Cambareri and wrongfully acknowledged by Grady**,** four days **after** the date the Associates I Mortgage was signed by virtue of that May '96 P of A.

26.     The Plaintiff had no knowledge of this transaction until on or about November 22, 2004 and Vincenza was not independently represented by counsel of her own choosing at this closing.

27.     The Associates I Mortgage was at the interest rate of 12.86% and required eight "points" ($7,839.99) to be paid by Mr. Cambareri and Vincenza to Associates**.**

28.     The proceeds of that **Associates I** Mortgage were divided in equal amounts of $55,676.70 between Vincenza and Nicolina Randazzo.

29.     No proceeds of that Associates Mortgage were received by Mr. Cambareri.

6

30.     Mr. Cambareri had no knowledge of the receipt of these monies by Vincenza or Nicolina Randazzo until on or about November 22, 2004.

31.     The fraudulently executed Associates I Mortgage was recorded in Liber 21647 at page 39 of Mortgages in the Westchester County Clerk's Office, Division of Land Records on June 4, 1996 and as such was an act of Forgery in the Second Degree as defined in §170.10 of the Penal Law of the State of New York on the part of the person who caused that Mortgage to be forged and then offered for recording and, as such, constituted an independent tortious act on the part of that person or persons and causes that person or persons to be responsible to the Plaintiff for the actual damages sustained by Mr. Cambareri as a result of that person or persons' improper and tortious conduct.

32.     Thereafter, on January 30, 1997, only months after the Associates I Mortgage was obtained, a further Mortgage and a Consolidation Agreement in the amount of $38,411.94 was given to Associates (Associates II).

33.     The procurement of this Associates II Mortgage was again orchestrated by Nicolina Randazzo.

34.     This Associates II Mortgage was also secured by 29 Spencer and was recorded in Liber 22485 at page 72 of Mortgages on February 18, 1997 and, as such, constituted an act of Forgery in the Second Degree as the same is defined in §170.10 of the Penal Law of the State of New York by the Defendant or Defendants who caused that Mortgage to be forged and then offered for recording and, as such, constituted an independent tortious act on the part of the person or persons who caused that Mortgage to be forged and then offered for recording, and, as such, causes that person or persons to be responsible to the Plaintiff for the actual damages sustained by Mr. Cambareri as a result of that person or persons' improper and tortious conduct.

7

35.     The Associates II Mortgage was executed by virtue of the same fraudulent May '96 P of A.

36.     All of the net proceeds of this Associate II Mortgage were received by Nicolina Randazzo.

37.     The Plaintiff received no proceeds of this Associate II Mortgage.

38.     The Plaintiff had no knowledge of this transaction or Nicolina Randazzo's receipt of the proceeds until on or about November 22, 2004.

39.     Vincenza was not independently represented by counsel of her own choosing at this closing.

40.     Thereafter, on July 24, 1997, yet a third Mortgage Loan and Consolidation Agreement was executed with Associates ("Associates III") resulting in a further indebtedness of $23,759.99 to be owed by Mr. Cambareri and Vincenza to Associates, still at the interest rate of 12.86% and which Mortgage loan was also secured by 29 Spencer.

41.     This Associates III Mortgage was again orchestrated by Nicolina Randazzo.

42.     This Associates III Mortgage was signed by virtue of the same May '96 P of A and recorded in Liber 22954 at page 134 of Mortgages on August 6, 1997 and, as such, constituted an act of Forgery in the Second Degree as the same is defined in §170.10 of the Penal Law of the State of New York on the part of the person or persons who caused that Mortgage to be forged and then offered that document for recording and, as such, constituted an independent tortious act on the part of that person or persons and causes that person or persons to be responsible to the Plaintiff for the actual damages sustained by Mr. Cambareri as a result of that person or persons' improper and tortious conduct.

8

43.     All of the net proceeds of the Associates III Mortgage were received by Nicolina Randazzo.

44.     The Plaintiff received no proceeds of the Associates III Mortgage.

45.     The Plaintiff had no knowledge of this closing until on or about November 22, 2004.

46.     Vincenza was not independently represented by counsel of her own choosing at this closing.

47.     Nicolina Randazzo directed Vincenza back to Associates for yet a fourth Mortgage (hereinafter Associates IV), this time a Mortgage executed on the 20th day of February, 1998 on 52 West Main in the amount of $161,999.99 at an interest rate of 11.99%.  Associates received eight "points" amounting to $11,999.99 as a result of its entry into this Mortgage.

48.     The Associates IV Mortgage was recorded in Liber 23717, page 319 of Mortgages on March 30, 1998 and again was signed on Mr. Cambareri's behalf by virtue of the "March 6" [sic]1996 Power (which was really the May '96 P of A) and, as such, was an act of Forgery in the Second Degree as the same is defined in §170.10 of the Penal Law of the State of New York by the person or persons who caused that Mortgage to be forged and then offered for recording and, as such, constituted an independent tortious act on the part of that person or persons and causes that person or persons to be responsible to Mr. Cambareri for the actual damages sustained by the Plaintiff as a result of that person or persons' improper and tortious conduct.

49.     At, or soon after, this Associates IV closing on February 20, 1998, for reasons yet unknown, Carmela Tiffany received $40,000 from the loan proceeds and Nicolina Randazzo the balance of the net loan proceeds.

50.     The Plaintiff received no proceeds from the Associates IV Mortgage.

51.     The Plaintiff had no knowledge of this Associates IV mortgage or the disbursement of these monies until on or about November 22, 2004.

52.     The Associates IV Mortgage was assigned to CitiFinancial Mortgage Company Inc. effective June 4, 2001.

53.     In March of 1999, after the four Associates Mortgage transactions set forth above, the Debtors paid off a mortgage on their residence at 10 Tall Pines Lane in Bedford Corners, New York (hereinafter **"10 Tall Pines Lane"**) which had been in the original principal amount of $271,000 and which had been taken out by the Debtors in February of 1995, prior to the four Associates Mortgage transactions.

54.     On December 21, 1999, the Debtors, in a handwritten "homemade" document, acknowledged having borrowed $150,000 from Fortunata and Fortunato Cambareri (collectively, "Fortunata and Fortunato"), who are not related to the Plaintiff or his wife, but are the parents of Carmela Tiffany.  The annual interest rate for this "debt" to Fortunata and Fortunato was set at 10% and the full amount of principal and interest was due to be paid on December 21, 2003. This homemade document stated that "if anything should happen to us" (the Debtors), Vincenza "will take responsibility."  The document went on to say that if anything "should happen to" Fortunata or Fortunato, any amounts due were to be paid to Fortunata and Fortunato's daughter, Carmela Tiffany.  In a notation to this document, Vincenza wrote, "I swear the above statement is true."

55.     Vincenza's purported assumption of responsibility for this to the Debtors was without consideration.

10

56.     This December 21, 1999 "loan" evolved after Nicolina Randazzo had previously borrowed $250,000 in cash from Carmela Tiffany to purchase a restaurant called the Kit N' Caboodle at 443 Lexington Avenue. Mount Kisco, New York.

57.     The $250,000 borrowed by Nicolina Randazzo from Carmela Tiffany came from proceeds of the sale of property owned by Fortunata at 21 West Street, Mount Kisco, New York.

58.     The title to this 21 West Street property had originally been held by Fortunato and Fortunata, but, was transferred to Fortunata's name alone because Fortunato was the defendant in a wrongful death case brought against him as a result of his slaying of an individual by the name of Rocco Papalia in Florida in or about 1998.

59.     Upon information and belief, Fortunato and Fortunata felt compelled to transfer their assets into Fortunata's name alone so as not to have their assets susceptible to any civil judgment Rocco Papalia's Estate might recover against Fortunato.

60.     Fortunata further beclouded the issue of the ownership of her and Fortunato's assets by giving $250,000 from the proceeds of the sale of 21 West Street to Carmela Tiffany, who in turn loaned that sum to the Debtors for their use in financing the purchase of Kit N' Caboodle.

61.     The $150,000 referenced in the December 21, 1999 homemade note was a sum in addition to the initial $250,000 advanced by Carmela Tiffany to the Debtors and had as its source, Fortunato and Fortunata.

62,     The May '00 P of A, as notarized by Dawn M. Randazzo, was used in conjunction with the execution of a fifth mortgage, a mortgage on 29 Spencer with Chase Manhattan Bank on the 27th day of June, 2000 in the amount of $206,500.00 at 11.15%.

63.     Although the May '00 P of A was signed by Mr. Cambareri before Dawn

11

M. Randazzo, Mr. Cambareri**,** who does not read English, was not informed that the document was a Power of Attorney, but was told by Vincenza at the time of the signing of the May '00 P of A that the document that he was signing had to do with his obtaining money from the State of New York as the result of the State of New York condemning a portion of 52 West Main for the purpose of widening West Main Street in the vicinity of 52 West Main and not that the May '00 P of A was to be used for the mortgaging of 29 Spencer.

64.     Vincenza made such false representation to her husband, the Plaintiff, at the behest of her sister, Nicolina Randazzo.

65.     The Plaintiff did not know he was giving Vincenza a Power of Attorney and did not intend to give the Chase Mortgage.

66.     The June 27, 2000 Chase Mortgage was recorded under WIID No.: 2001047- 000083- Control No.: 410470502 on December 22, 2001 at the Westchester County Clerk's Office, Division of Land Records.

67.     The proceeds of the June 27, 2000 Chase Mortgage, the fifth mortgage purportedly given by the Plaintiff and Vincenza in a four year period, paid off three of the Associates Loans which were at 12.86%, by means of a loan with only the marginally lower interest rate of 11.15%.

68.     The Plaintiff received no proceeds from the Chase Mortgage and did not know the proceeds therefrom were being used to pay off three of the four Associates Mortgages, since he had no knowledge of the existence of the Associates loans. .

69.     On this very same date of June 27, 2000, and at the very same time and place, the Debtors executed a Mortgage with Chase for $490,000, using 10 Tall Pines Lane as security, at

12

the offices of Joseph Sayegh, the very same attorney who represented Chase in the June 27, 2000 closing between Chase and Vincenza.

70.    On July 11, 2000, the Debtors satisfied a mortgage on 10 Tall Pines.   This mortgage, in an original amount of $354,000, had been taken out in 1999.  A Satisfaction of this mortgage was recorded on November 16, 2000 under Control No.: 403050073, WIID No.: 2000305-000035 in the Westchester County Clerk's Office, Division of Land Records.

71.    A portion of the $490,000 borrowed by from Chase on June 27, 2000 was used by the Debtors to pay off the $354,000 mortgage.

72.    On December 19, 2000, yet a sixth Mortgage was purportedly executed by Mr. Cambareri and Vincenza since May of 1996, this one between the Plaintiff and Vincenza and Accredited Home Lenders, Inc. ("Accredited") in the amount of $280,000 using 80 McLain Street as security.

73.    At the time of signing this Mortgage with Accredited, the Plaintiff was told by Vincenza that by signing this Accredited mortgage, the Plaintiff's real property taxes as combined with the newly created Accredited mortgage principal and interest payment would result in a lower combined monthly payment than he and his wife, Vincenza, had been paying under their existing 1993 mortgage.

74.    This false representation by Vincenza to her husband, the Plaintiff, was made at the behest of her sister, Nicolina Randazzo.

75.    The promised reduction in monthly payment was not to be the case because the $200,000 mortgage that had been taken out by the Plaintiff and his wife on 80 McLain on August 17, 1993 had been increased to a principal indebtedness of $280,000 by virtue off the execution of this mortgage with Accredited.

76.     Although the Plaintiff signed the Accredited mortgage before a notary, he did not know what he was signing, since he does not read English well, did not attend this closing and did not have an attorney advising him as to any aspect of this mortgage transaction.

77.     The application for the Accredited mortgage, which the Plaintiff did not sign, falsely set forth his employer as being S&R Landscaping of 10 Tall Pines Lane, Mount Kisco, New York, the address being that of the Debtors, their son, Serafino Randazzo and S&R Landscaping being the business of Serafino Randazzo.

78.     The Plaintiff has never worked for S&R Landscaping.

79.     Whoever submitted this loan application to Accredited submitted a fraudulent document so as to obtain the Accredited mortgage financing, and it was again Nicolina Randazzo who orchestrated the Accredited mortgage.

80.     On January 4, 2001, the Debtors, as the owners of 10 Tall Pines, gave a Mortgage on 10 Tall Pines to Abey Corporation, a corporation controlled by Carmela Tiffany's husband, whose address was listed as 11 Buxton Road, Bedford Hills, New York, the same as Carmela Tiffany's then address.

81.     This mortgage on 10 Tall Pines was to secure the $250,000 loan referenced above from Fortunato and Fortunata, via Carmela Tiffany, to the Debtors for the purchase of Kit 'N Caboodle Restaurant.

82.     This Mortgage with Abey Corporation was an attempt by Carmela Tiffany to cause the indebtedness of the Debtors to be secured by a mortgage to Abey Corporation and further beclouded the source of the funds, Fortunato and Fortunata.

83.     Prior to the Debtors executing the $250,000 Mortgage to Abey Corp. on January 4, 2001, the Debtors had taken out a Mortgage on 3 West Street in Mount Kisco, New York with

Italy Peru Corp. (hereinafter "Italy Peru") for $30,000. That Mortgage was recorded in the Westchester County Clerk's Office under Liber 25705, page 340 of Mortgages on June 3, 1999. Italy Peru was a corporation in which the Debtors were two of its four shareholders.

84.     On April 12, 2002, the Italy Peru Mortgage in the amount of $30,000 was satisfied by the Debtors**.** That Satisfaction was recorded on July 31, 2002 under Control No.: 422030002, WIID No.: 2002203-000001 in the Westchester County Clerk's Office, Division of Land Records.

85.     Within three (3) days of the Italy Peru Mortgage on 3 West Street being satisfied by the Debtors, their son, Serafino Randazzo acquired title to 3 West Street, Mount Kisco, on April 15, 2002 from his parents, the Defendants, for a stated purchase price of $272,000. The Deed from the Debtors to their son was recorded under Control No.: 422200388, WIID No.: 2002220-000180 and recorded on September 5, 2002 in the Westchester County Clerk's Office, Division of Land Records.

86.     Again, on this very same day, April 15, 2002, the Debtors gave yet another Mortgage on 10 Tall Pines**,** this one to an elderly individual residing in Mount Kisco, New York, named Emily Habib, to secure a loan from her in the amount of $49,040.

87.     Serafino Randazzo has stated to numerous individuals, including the Plaintiff's adult children, on numerous occasions that he could "get all the money he wanted" at any time from mortgage broker, Barbara Stoll ("Stoll")**.** This claim is borne out by the number, frequency and amount of the mortgages Serafino Randazzo was able to obtain in a 19-month period, i.e., four mortgages totaling One Million Two Hundred Fifty-five Thousand One Hundred ($1,255,100) Dollars.

88.     Serafino Randazzo's statements about being able to get "all the money he wanted" began to manifest themselves on April 15, 2002, as he obtained the first of the above-referenced four mortgages on one of three separate properties that he acquired from his parents, the Debtors, in the corresponding period.

89.     Again, on that very same day, April 15, 2002, Serafino Randazzo, took out a Mortgage with Wells Fargo Bank for $244,800 on the 3 West Street property allegedly conveyed to him on that date by his parents for $272,000.

90.     Thereafter, on November 18, 2002, Serafino Randazzo obtained a further Mortgage in the amount of $340,000 from Ameriquest Mortgage Company, again providing as security 3 West Street property referenced above.

91.     On April 22, 2002, Pietro Randazzo gave a UCC Financing Statement for his interest in a Cooperative Apartment owned by him and known as Unit 1C, 28 Barker Street to Abey Corp. located at Carmela Tiffany's then address, which was the corporation controlled by her husband and to which, in January 2001, the Debtors had executed a mortgage secured by 10 Tall Pines, as set forth above.

92.     A foreclosure sale in an action by Citibank, N.A. against the Debtors with regard to Unit 1C, 28 Barker Street, Mount Kisco, New York, was to have taken place on January 7, 2005.

93.     On February 11, 2003, Nicolina Randazzo caused a New York domestic corporation to be formed through Corporation Services Company and through the offices of Solomon Abrahams, Esq., upon information and belief, an attorney no longer permitted to practice law due to his suspension or disbarment.  The name of that corporation is Commercial Realty Spec. Corp**.**

16

94.     The address to which the Secretary of State has on record as the address for the mailing of any process against the corporation was and is 80 McLain Street, Mount Kisco, New York, the residence of the Plaintiff and his wife, Vincenza.

95.     The Plaintiff had no knowledge of the existence of Commercial Realty Spec. Corp., formed by Nicolina Randazzo or her use of his residence as its corporate address until February 2005 when the Plaintiff received a notice from the New York State Department of Taxation and Finance addressed to Commercial Realty Spec. Corp. at 80 McLain and turned that notice over to his counsel.  Plaintiff's Counsel then made an inquiry of the Secretary of State which led to the discovery with regard to Nicolina Randazzo's involvement with the offices of Solomon Abrahams and Associates, Inc. in the formation of Commercial Realty Spec. Corp.

96.     On February 21, 2003, Nicolina Randazzo caused the second forged Power of Attorney (the "Feb '03 P of A") purportedly executed by the Plaintiff, to be notarized by Joseph Cambareri ("Joseph").

97.     Nicolina insured her ability to perpetrate her fraud in the use of this Power of Attorney by having herself designated as the alternate donee of the Power of Attorney on the Feb '03 P of A.

98.     This Feb '03 P of A was then used by the Debtors at a closing with Emigrant Savings Bank that took place on April 4, 2003.

99.     The use of this forged Feb '03 P of A with regard to the execution of this mortgage with Emigrant and its recording constituted Forgery in the Second Degree as the same is set forth in §170.10 of the Penal Law of the State of New York by the person or persons who caused that Mortgage to be forged and then offered that document for recording, and as such, constituted an independent tortious act on the part of that person or persons and causes that

person or persons to be responsible to the Plaintiff for the actual damages sustained by Mr. Cambareri as a result of that person or persons' improper and tortious conduct.

100.    Joseph has admitted to numerous individuals that the Feb '03 P of A was not signed in front of him by *any* individual, let alone the Plaintiff.

101.    By means unknown to Plaintiff, Nicolina Randazzo at some point engaged the services of Stoll with regard to obtaining numerous loans for herself, her husband, Pietro, her son, Serafino Randazzo, and her sister Vincenza, all of which loans were to benefit Nicolina Randazzo and those, including Stoll, receiving "fees" for assisting in fraudulently obtaining those loans.

102.    The Plaintiff has never met or spoken to Stoll.

103.    Stoll involved herself in these transactions without ever having met or spoken to the Plaintiff.

104.    On April 4, 2003, Nicolina Randazzo and Stoll convinced Vincenza to execute the seventh Mortgage on the Plaintiff's and Vincenza's real property since May of 1996, in the principal amount of $700,000 with Emigrant using 80 McLain as security.  This $700,000 loan paid off the CitiFinancial (formerly Associates IV) loans on 52 West Main in the then principal amount of $190,567.16 and the Saxon Mortgage which had been the Accredited Mortgage for $280,000 on 80 McLain, and which had increased its principal amount to $343,489.44.

105.    The application for this Mortgage had both Vincenza's and Mr. Cambareri's signatures forged.

106.    Nicolina Randazzo received all of the net proceeds of this closing in the amount of approximately $111,516.13.

107.    The Plaintiff received no proceeds of this transaction.

18

108.    This closing was effected by the use of the Feb. '03 P of A and among those receiving mortgage proceeds at that time was Ivy Mortgage, which received $24,500.

109.    Stoll received some or all of this $24,500 payment to Ivy Mortgage.

110.    The use of this forged Feb '03 P of A in the execution and then recording of the mortgage with Emigrant constituted Forgery in the Second Degree as the same is set forth in §170.10 of the New York Penal Law by the person or persons who caused that Mortgage to be forged and then offered for recording and, as such, constituted an independent tortious act on the part of that person or persons and causes that person or persons to be responsible to Mr. Cambareri for the actual damages sustained by the Plaintiff as a result of that person or persons' improper and tortious conduct.

111.    Nicolina Randazzo caused $1,150 from the proceeds of the mortgage taken out with Emigrant Savings Bank on April 4, 2003 to be paid to S. Abrahams & Associates, Inc., P.C. for its legal services in the formation of Commercial Realty Spec. Corp., as set forth above.

112.    On March 17, 2003, the Debtors had transferred to their son, Serafino, a/k/a Sam Randazzo, by Deed dated March 7, 2003 and recorded under Control No.: 441190912, WIID No.: 204419-0000366, Westchester County Clerk's Office, Division of Land Records, title to real property owned by the Debtors at 228 West Street, Mount Kisco, New York (hereinafter 228 West Street).  The consideration for this transfer, according to the Deed from the Debtors to Serafino Randazzo of the same date, was $0.

113.    This 228 West Street "purchase" by Serafino Randazzo was accomplished by means of a Mortgage from Argent Mortgage to Sam Randazzo, a/k/a Serafino Randazzo in the amount of $355,300.

19

114.    On August 21st, 2003, a third Power of Attorney (the Aug. '03 P of A**)** was notarized by Joseph without, as has been admitted by Joseph, anyone, let alone the Plaintiff, being in Joseph's presence at the time of the signing of that Aug '03 P of A**.**

115.    With the newly minted Aug '03 P of A in hand, Nicolina Randazzo caused Vincenza to enter into an eighth mortgage, this one with Eastern on September 19, 2003, for the purposes of obtaining a $232,000 loan from Eastern, providing as security both the 29 Spencer and 52 West Main properties.

116.    Stoll, was once again, at the urging of Nicolina Randazzo involved in procuring this Mortgage.

117.    As in the Emigrant loan process, Stoll participated in this fraudulent Mortgage application, its processing and the issuance of the mortgage commitment and aided and abetted Nicolina Randazzo in bringing about this transaction and in receiving the proceeds of the mortgage loan.

118.    The entirety of the net proceeds from the Eastern closing was diverted by and to Nicolina Randazzo by a check dated the 26th day of September, 2003, in the amount of $95,000 made payable to "cash" and endorsed by Serafino Randazzo**,** the proceeds of which were then received by Serafino Randazzo and then used in a real estate transaction discussed hereinafter in which Serafino Randazzo obtained title to 32 Rome Avenue, Bedford Hills New York the address at which the Debtors now live.

119.    Nicolina Randazzo did not attend this September 19, 2003 closing, but her son, Serafino Randazzo drove Vincenza to New York City for the closing.

120.    The Plaintiff received no proceeds from this transaction..

121.    The use of this forged Aug '03 P of A in the execution and then recording of the mortgage with Eastern constituted forgery in the Second Degree as the same is set forth in §170.10 of the Penal Law of the State of New York by the person or persons who caused that Mortgage to be forged and then offered for recording and, as such, constituted an independent tortious act on the part of that person or persons and causes that person or persons to be responsible to the Plaintiff for the actual damages sustained by Mr. Cambareri as a result of that person or persons' improper and tortious conduct.

122.    On December 4, 2003, Serafino Randazzo obtained title to property located at 32 Rome Avenue in Bedford Hills, Town of Bedford, County of Westchester and State of New York for the consideration of $350,000 using, in part, the $95,000 he obtained as a result of the Eastern Savings Bank refinancing orchestrated by Nicolina Randazzo.  That Deed was recorded under Control No.: 440930466, WIID No.: 2004093-000148 in the Westchester County Clerk's Office, Division of Land Records.

123.    At this closing on December 4, 2003, Serafino Randazzo was represented by the law firm of Ballon, Stoll, Bader and Nadler, 1450 Broadway, 14th Floor, New York, NY, a law firm in which Stoll's late husband had been a named partner.

124.    This December 4, 2003 acquisition by Serafino Randazzo was obtained, in part, by means of a Mortgage from Homestyle Mortgage Services in the amount of $315,000 using 32 Rome Avenue as security.  This Mortgage was recorded under Control No.: 440930564, WIID No.: 2004093-000148 in the Westchester County Clerk's Office, Division of Land Records.

125.    On December 30, 2003, Nicolina Randazzo borrowed the sum of $40,000 from the Plaintiff's son, Rocco Cambareri.

21

126.   Nicolina Randazzo caused said $40,000, in a bank check drawn by Rocco Cambareri on an account maintained by him at the HSBC Bank, to be paid to Kenny Hansen, a reputed money lender, who had lent considerable sums of money to Nicolina Randazzo and who was, and is, a friend and business associate of Stoll.

127.   This $40,000 loan was repaid to Rocco Cambareri by Nicolina Randazzo on January 9, 2004 by payment by means of a bank check from an account maintained by Nicolina Randazzo at the Chase Bank, account number 507001117165.

128.   On March 19, 2004, Serafino Randazzo executed a Mortgage in the amount of $403,750 to Ameriquest Mortgage Corporation using the property at 3 West Street in Mount Kisco, New York as collateral.  This Mortgage was recorded in the Westchester County Clerk's Office under Control Number 442820080, WIID 200482-000019.

129.   Nicolina Randazzo, through the direction and/or assistance of David Mignon ("Mignon"), a "financial advisor" and "mortgage broker" with offices in White Plains, New York, thereafter entered into a scheme whereby, by using yet a fourth forged Power of Attorney (the May '04 P of A), 52 West Main would be "sold" to Equinox and Matrix Real Estate Solutions, Inc. ("Equinox"), a New York corporation with offices at 1700 Central Park Avenue, Suite D, Yonkers, New York 10701.

130.   The "sale" of 52 West Main to Equinox took place on June 10, 2004 and the Deed was purportedly signed at closing by Vincenza both individually and on behalf of Carmelo Cambareri by a Power of Attorney dated May 28, 2004 (the May '04 P of A) notarized by Juan G. Lopez.

131.    At said closing, Equinox had checks paid on its behalf from the personal checking account of Sokol Biberaj, to various individuals, including Mignon and the aforementioned reputed money lender, friend and business associate of Stoll, Kenny Hansen.

132.    The Plaintiff had no knowledge of this transaction and received no proceeds from the "sale" of his property.

133.    The use of this forged May '04 P of A in the execution and then recording of the Deed to Equinox constituted Forgery in the Second Degree as the same is set forth in §170.10 of the New York Penal Law by the person or persons who caused that Deed to be forged and then offered for recording and, as such, constituted an independent tortious act on the part of that person or persons and causes that person or persons to be responsible to the Plaintiff for the actual damages sustained by Mr. Cambareri as a result of that person or persons' improper and tortious conduct.

134.    This "sale" to Equinox for a purchase price of $415,000 involved, as consideration, a reinstatement of the Eastern mortgage, which was then in default (and, which Eastern mortgage was, without Eastern's consent, assumed by Equinox), the payment of $100,000 to the reputed money lender and "friend" of Stoll, Kenny Hanson for a debt claimed to be owed to him by Nicolina Randazzo, but for which there is no apparent documentation, and a payment to Mignon in the amount of $5,000, for no apparent reason.

135.    Further, attendant to and as a result of this "sale" of 52 West Main was the creation of a "Use and Occupancy Agreement" by Frank Acocella ("Accocella"), as executed between Equinox, Mr. Cambareri and Vincenza, a document executed on behalf of Mr. Cambareri by virtue of the forged May '04 P of A.

136.    This June 10, 2004 Use and Occupancy Agreement called for the Plaintiff and Vincenza, even though, by virtue of the "sale" to Equinox, no longer owning 52 West Main, to pay the sum of $6,000 per month to Equinox, and if these payments were not made, the Plaintiff and Vincenza would be in default under the terms of that Use and Occupancy Agreement.

137.    According to the terms of the Use and Occupancy Agreement, notice of any default was to go to Equinox, in care of Acocella's law office; if to the Escrowee, who was also Acocella, also to Acocella's law office and, if to Mr. Cambareri and Vincenza, to P.O. Box **290**, a post office box in Mount Kisco, New York, not owned or maintained by the Plaintiff or Vincenza, **not** to the home address of the Plaintiff and Vincenza at 80 McLain Street or to even 29 Spencer or to 52 West Main, their other properties.

138.    Post Office Box 290 at the Mount Kisco Post Office was registered in April of 1996 and thereafter to an individual named Ross Eatman and/or Eatman Media Services of 4 West Street, Mount Kisco, New York, a property immediately adjacent to the 3 West Street address of property then owned by the Debtors' son, Serafino Randazzo.

139.    Notwithstanding the use of the P.O. Box 290 mailing address in the Use and Occupancy Agreement, a Notice to Cure and Termination under the Use and Occupancy Agreement from Equinox, as signed by Acocella, was sent by Acocella to the Plaintiff and Vincenza at P.O. Box **292.**

140.    Post Office Box **292** in Mount Kisco, New York was registered at that time to Serafino Randazzo, S&R Landscaping, Serafino's landscaping business, and Kit N' Caboodle Restaurant, the restaurant owned and operated by Nicolina Randazzo, the restaurant for which Nicolina Randazzo had borrowed money from Carmela Tiffany.

141.    An Option to Purchase Agreement was also executed at this June 10, 2004 closing, again by using the forged May '04 P of A and the Option to Purchase Agreement contained a provision that so long as there was not a default, under the terms of that Agreement or the Original Use and Occupancy Agreement, the Plaintiff and Vincenza could re-purchase their own property from Equinox for the sum of $495,000 within 24 months of the 10th day of June, 2004 closing.

142.    Vincenza, allegedly being in default of both the Use and Occupancy Agreement and the Option to Purchase Agreement, presumably executed a second Option to Purchase Agreement prepared by Acocella, dated October 12, 2004, for Vincenza and for Mr. Cambareri by means of the same forged May '04 P of A.

143.    This second Option to Purchase Agreement called for the Plaintiff's and Vincenza's "redemption" price to be increased to $560,000 from $495,000, i.e, $145,000 more than the price for which Equinox had allegedly purchased the property from the Plaintiff and Vincenza on June 10, 2004 and required that any "redemption" had to take place within 19 days - to wit, October 31, 2004.

144.    This "redemption" price effectively would have been further inflated by the Plaintiff's and Vincenza's payment of the $6,000 a month under the Use and Occupancy Agreement fee, which would have reduced the principal of the Eastern Mortgage, which monthly payments effectively relieved Equinox from bearing any ongoing financial burden whatsoever as a result of its "purchase" from the Plaintiff and Vincenza.

145.   At or before the execution of the second Option to Purchase Agreement, Acocella advanced monies, not to Vincenza or to the Plaintiff, but to Nicolina Randazzo's landlord for Kit N' Caboodle and to Pietro Randazzo.

146.   Between the date of the Equinox closing, June 10, 2004 and the date of the second Option to Purchase Agreement, October 12, 2004, Acocella caused $12,000 to be wired to Compass Bank to the credit of Nicolina Randazzo's landlord at the Kit N Caboodle Restaurant.

147.   Further, three days later, after the signing of the October 12, 2004 second Option to Purchase Agreement, October 15, 2005, Acocella issued two checks from his personal account, not his business or professional account or Equinox's account, one check to Pietro Randazzo for $1,000 with a notation "52 Main Street" affixed thereto and a second check also made payable to Pietro Randazzo in the amount of $2,000 with the same notation, **"52 Main Street"** affixed thereto.

148.   This October 12, 2004 second Option to Purchase Agreement was prepared by Acocella, given to Nicolina Randazzo to be signed, was improperly notarized by Edgar Chacon and checks for the benefit of the Debtors were issued and funds were wired by Acocella to Nicolina Randazzo's landlord, all without further involvement of either Mr. Novak, Vincenza and certainly not Carmelo Cambareri.

149.   On June 10, 2004, on the same day as the Equinox closing was taking place, Serafino Randazzo took out another Mortgage with Ameriquest, this time for the sum of $467,500, providing as security for that Mortgage, the 228 West Street property, transferred by the Debtors to Serafino Randazzo on the 17th day of March, 2003.

150.   On July 7, 2004, Vincenza, after having rendezvoused with Nicolina , Fortunata and Carmela Tiffany**,** was taken by that trio to the Katonah, New York offices of Michael Katz, the attorney for Carmela Tiffany and Abey**,** ostensibly for the purposes of discussing the aforesaid December 21, 1999 "homemade" note between and among the Debtors and Carmela Tiffany's parents Fortunato and Fortunata for which Vincenza purportedly had assumed responsibility without consideration.

151.   Vincenza went to Mr. Katz's office with the above-referenced group without any attorney representing her interests.

152.   Fortunato and Fortunata were still very much alive in July of 2004 and nothing "had happened" as of that time to the Debtors so as to invoke Vincenza's purported obligation to repay the Debtors' loan from Fortunato and Fortunata via their daughter, Carmela Tiffany.

153.   After the discussion of July 7, 2004, Vincenza returned to Mr. Katz' office on July 9th, 2004 accompanied only by Carmela Tiffany  and executed a Promissory Note and Mortgage to Carmela Tiffany for $158,125 on 29 Spencer, the ninth mortgage on the Plaintiff's property orchestrated by Nicolina Randazzo.

154.   This Note and Mortgage also were given for no consideration or reason whatsoever and again without Vincenza having the benefit of counsel.

155.   This indebtedness, according to the Mortgage with Carmela Tiffany, which Mortgage Carmela Tiffany's attorney had prepared and Carmela Tiffany had had Vincenza sign without benefit of counsel, was without consideration and intended purely to benefit Carmela Tiffany and Nicolina Randazzo by providing additional security for

the loan Fortunato and Fortunata had extended, via their daughter Carmela Tiffany, to Nicolina Randazzo for Kit N Caboodle.

156.    The fact that the Mortgage that was signed used 29 Spencer as security, like all of the other mortgages, caused economic harm to the Plaintiff, negatively affected his financial circumstances, and placed an improper lien on his property.

157.    The Plaintiff knew nothing of this transaction until on or about November 22, 2004.

158.    On October 7, 2004, Vincenza was presented by Nicolina Randazzo with a Voluntary Petition in Bankruptcy for Vincenza to sign.

159.    It is unclear who assisted Nicolina Randazzo in preparing this Bankruptcy Petition, but the signature and the dating of it on October 7, 2004 appears to be in the handwriting of Vincenza.

160.    Vincenza was not represented by counsel in the preparation, signing or filing of this Bankruptcy Petition.

161.    On October 8, 2004, Nicolina Randazzo filed Vincenza's petition seeking relief under Chapter 13 of the Bankruptcy Code with this Court under case number 04-20583 (ASH) ("Vincenza's Chapter 13 Case").

162.    The filing of the petition in Vincenza's Chapter 13 Case, of which the Plaintiff was unaware, had negative financial implications for the Plaintiff.

163.    On October 10, 2004, a check forged by Nicolina Randazzo on the Plaintiff's and Vincenza's joint account with Chase Bank, check number 3258, was made payable and issued to Dave Mignon in the amount of $800.

164.   A statement <u>withdrawing</u> Vincenza's Chapter 13 Case (the "Notice of Withdrawal of Vincenza's Chapter 13 Case") bearing a forgery of Vincenza's signature thereon, was filed by Nicolina Randazzo with the Bankruptcy Court on November 3, 2004, thereby causing fraudulent papers to have been filed by Nicolina Randazzo not only with the Westchester County Clerk's Office and with the lending institutions involved in the different financial and real estate transactions set forth in this action, but also with this Court.

165.   On October 21, 2004, an Assignment of Rents to Eastern signed by Vincenza at the Eastern closing on September 19, 2003 was recorded by Eastern in the Westchester County Clerk's Office, Division of Land Records, thereby depriving the Plaintiff of the right to the rents from 52 West Main.

166.   The filing of this Assignment of Rents signed by virtue of a forged Power of Attorney as set forth above constituted the act of Forgery in the Second Degree as the same is defined in §170.10 of the Penal Law of the State of New York by the person or persons who caused that Assignment of Rents to be forged and then offered for recording and, as such, constituted an independent tortious act on the part of that person or persons and causes that person or persons to be responsible to the Plaintiff for the actual damages sustained by Mr. Cambareri as a result of that person or persons' improper and tortious conduct.

167.   On October 24, 2004, a Satisfaction of Mortgage of the Ameriquest Mortgage, originally dated November 18, 2002 taken out by Serafino Randazzo on 3 West Street was filed with the Westchester County Clerk's Office.

168.     On November 5th, 2004, two days after the forged Notice of Withdrawal of Vincenza's Chapter 13 Case was filed, perhaps the most brazen of all transactions of which the Plaintiff was a victim took place, a transaction in which the title to the Residence at 80 McLain, in which the Plaintiff and Vincenza still reside, was transferred to Pascale E. Decaudin ("Decaudin") with the aid and assistance of Sunset Mortgage Company, L.P. ("Sunset"), Edward G. DeFrancesco ("DeFrancesco"), and Mignon.

169.     Acocella having been lured into this conspiracy by Mignon and Nicolina Randazzo for the "sale" of 52 West Main then had involuntarily involved himself in the sale of the Plaintiff's and Vincenza's residence at 80 McLain, again, upon information and belief, at the behest of Mignon and Nicolina Randazzo, and as a result of DeFrancesco, a non-lawyer, having prepared a Contract of Sale for an inflated price and having inserted Acocella's name as Plaintiff's attorney without Acocella's authorization to do so.

170.     Copies of the closing documents for this transaction indicate that Acocella had, for a period of time in October of 2004, held himself out as the attorney for the Plaintiff and Vincenza but it has been determined that this was done by DeFrancesco in spite of Acocella's objection.

171.     Documents prepared for the Decaudin closing included a Use and Occupancy Agreement and Option to Purchase Agreement in nearly identical format and typeset as the June 10, 2004 Use and Occupancy Agreement and Option to Purchase Agreement and October 12, 2004 Option to Purchase Agreements prepared by Acocella and used in the 52 West Main sale except for the dollar amounts, the fact that the name Decaudin had replaced Equinox, and the address used the Notice for Default for

Vincenza and the Plaintiff was P.O. Box **292**, Mount Kisco, New York, the post office

box of Serafino Randazzo, S&R Landscaping and Kit 'N Caboodle**,** the restaurant owned

by Nicolina Randazzo.

172.    The purchase price for the Decaudin purchase of 80 McLain was listed on

closing documents as $1,800,000.00 and was financed by means of a $1,062,000.00

mortgage loan with Sunset.

173.    According to the papers relative to the Decaudin closing, the checks at

closing did not total the $1,800,000.00 sales price but some $950,000.00 less than that

amount.

174.    Nicolina Randazzo, DeFrancesco and Mignon crafted this financing

scheme and title transfer transaction and Mignon communicated in writing directly with

Acocella with regard to this transaction, which Mignon has characterized, in writing, as

being for the benefit of **"**Randazzo,**"** the surname of the Debtors and their son.

175.    The pay-off letter issued by Emigrant with regard to the payoff of the

aforesaid Emigrant mortgage, on 80 McLain was sent to Mignon & Associates, Inc**.** at 50

Main Street, White Plains, New York.

176.    Correspondence from the title insurance company, which would insure

Decaudin and Sunset's title interests to 80 McLain**,** was sent to Acocella <u>a month before

the closing</u> .

177.    At this closing on November 5, 2004, the Emigrant Savings Bank loan

which had been taken out on April 4, 2003 in the amount of $700,000 was satisfied, but

for an amount of $844,113.66**.**

178.   At this closing on November 5, 2004, Mignon & Associates received a check in the amount of $40,000 for unknown reasons.

179.   At this closing, Michael Siegel, as the attorney for both Decaudin and Sunset, received a check in the amount of $26,000.00, for as yet undefined reasons.

180.   The Use and Occupancy Agreement, which had the purchase price handwritten in at $1,800,000.00 instead of the sum of $1,180,000.00 as typed, gave the Plaintiff the "right" once again to repurchase his Residence for $1,800,000.00 but still required him to pay Decaudin's monthly mortgage and all other monthly expenses relating to the 80 McLain for the two years immediately after November 5, 2004.

181.   On November 5, 2004, Nicolina Randazzo drove Vincenza to DeFrancesco's office in White Plains where Vincenza was met by DeFrancesco. DeFrancesco then drove Vincenza and Nicolina Randazzo to the closing in Rockland County, New York, where Vincenza met Cooper for the first time.

182.   During the course of this closing, Nicolina Randazzo and Vincenza were separated in one room and Decaudin, Mignon and DeFrancesco were in another, along with Decaudin's attorney, Siegel.

183.   The transactions which allegedly were effected at this closing were effected by the fifth forged Power of Attorney, the "Nov 4 '04 P of A" as notarized by Joseph and the sixth forged Power of Attorney, the **"Nov 5 '04 P of A"** as notarized by Venita Jefferson.

184.   Decaudin and his attorney, being concerned by the fact that the documents that had to be signed at this closing were being signed by virtue of a Power of Attorney notarized by an individual having the same last name as the Plaintiff, i.e., <u>Cambareri</u>,

somehow or another obtained a Power of Attorney on which the Plaintiff's name was forged by someone and then notarized by Venita Jefferson, the Nov 5 '04 P of A.

185.    Both the Nov 4 '04 P of A and Nov 5 '04 P of A had a direction set forth on them that they were being recorded at the request of and were to be returned after recording by mail to Acocella at his law office's address.

186.    The use of the forged Nov 4 '04 P of A and Nov. 5 '04 P of A to cause documents to be signed and offered for recording in the Westchester County Clerk's Office constituted acts of Forgery in the Second Degree as the same is defined in §170.10 of the Penal Law of the State of New York by the person or persons who caused documents to be forged and then offered for recording and, as such, constituted independent tortious acts on the part of that person or persons and causes that person or persons to be responsible to the Plaintiff for the actual damages sustained by Mr. Cambareri as a result of that person or persons' improper and tortious conduct.

187.    It is clear that this "Surrender of Possessions" (sic) agreement was prepared in the same typeface as were the Use and Occupancy and Option to Purchase Agreements that were prepared using Acocella's format and executed in the course of the Equinox closing.

188.    Although this closing took place on November 5, 2004 the Plaintiff received no notification from Decaudin, or anyone acting on Decaudin's behalf, that 80 McLain is purportedly no longer his or that he was required to surrender or vacate his Residence.

189.    At or before the Decaudin closing, a payoff notice was provided by Carmela Tiffany's attorney to Acocella indicating that the loan payoff for the promissory

note and mortgage which Carmela Tiffany compelled Vincenza to sign on July 9th, 2004 had as its payoff figure as of November 5, 2004 the amount of $165,516.  The payoff notice from Carmela Tiffany's attorney made reference to "promissory note - Enza Cambareri and Nicolina Randazzo".  It is unclear whether this sum was, in fact, paid at the November 5, 2004 closing.

190.    After this November 5, 2004 closing, the Sunset mortgage was purchased by and/or assigned to Morgan Stanley Mortgage Capital, Inc.

191.    By reason of all of the foregoing actions by the Debtors, the plaintiff has been damaged in excess of $3,000,000, with the exact amount of his Cambareri Claims to be fixed and determined at trial.

192.    At some point after November 5, 2004, Carmela Tiffany, and perhaps others, filed a petition for involuntary bankruptcy against the Debtors in the United States Bankruptcy Court for the Southern District of New York purportedly seeking to force the Debtors into bankruptcy by using their failure to pay the debt from the Debtors to Carmela Tiffany as the basis for that bankruptcy petition (the "Debtor's Prior Bankruptcy Case").

193.    The Debtor's Prior Bankruptcy Case was resolved by the purchase by Serafino Randazzo of 10 Tall Pines from the Debtors and his giving a Note and/or Mortgage to Carmela Tiffany for the debt on which the involuntary petition was based.

194.    On October 10, 2005 (the "Filing Date"), the Debtors commenced the instant Bankruptcy Case.

195.    The Debtor's Petition in this Bankruptcy Case does not identify or disclose the Debtor's Previous Bankruptcy Case.

196.    The original schedules of assets and liabilities and the original statement of financial affairs filed by the Debtors in this Bankruptcy Case pursuant to Section 521 of the Bankruptcy Code and Rules 1007 and 1008 of the Bankruptcy Rules (hereinafter collectively referred to as the "Schedules" and the "Statement of Financial Affairs") state that the Debtors have virtually no non-exempt assets of any value, including: (a) "Personal Jewelry" valued at $200.00; (b) a 1994 Mercedes valued at $1,500.00; and (c) a 1995 Grand Cherokee Laredo stated to be "inoperable – engine problems" valued at $100.00.

197.    The Schedules and Statement of Financial Affairs do not identify any transfers made by the Debtors to or for the benefit of their children within the one year prior to the Filing Date.

198.    The Schedules and Statement of Financial Affairs do not properly identify certain creditors of the Debtors, including Acocella, Stoll, Kenny Hanson or Carmela Tiffany.

199.    The Schedules state that the Plaintiff holds a contingent, unliquidated and disputed claim against both of the Debtors in the amount of $3,000,000 relating to the Cambareri Claims described above, and that Mr. Cambareri and his wife, Vincenza, hold an unliquidated and disputed claim against both of the Debtors listed in the amount of $700,000 based on a "personal loan" (the "Additional Cambareri Claim").

200.    On December 22, 2005 the Debtors appeared and were examined at the initial meeting of creditors held pursuant to Section 341 of the Bankruptcy Code (the "Meeting of Creditors") regarding some of their financial affairs, including: (a) unscheduled transfers made to their children; (b) the Jeep Grand Cherokee that Pietro was

seen driving a few days prior to the Meeting of Creditors; (c) the value of the diamond ring owned by Nicolina Randazzo that was not listed in the Schedules; (d) transactions between the Debtors and creditors who were not identified or who were improperly identified in the Schedules and Statement of Financial Affairs; (d) the basis of the Cambareri Claims; (e) the basis for the statement in the Schedules that the Additional Cambareri Claim was based on a personal loan; and (f) documentation regarding the foregoing matters that was requested by Jeffrey L. Sapir, the permanent Chapter 7 Trustee in the Bankruptcy Case, and by counsel for the Plaintiff.

201.    On January 10, 2006 the Debtors filed amendments to the Schedules and Statement of Financial Affairs (the "Amended Schedules and Amended Statement"), consisting of an amendment to the Debtors' current income reflected in Schedule I, and reflecting that the Debtors' had transferred their residence at 10 Tall Pines Lane in Mount Kisco to their son, Serafino Randazzo, in January 2005.

202.    The Debtors have not filed any further amendments or corrections to the Schedules and Statement of Financial Affairs, as amended by the Amended Schedules and Amended Statement.

203.    The Debtors have failed to turnover any documentation regarding all of the transfers made to their children, and all documents pertaining to the Cambareri Claims and the Additional Cambareri Claim that were requested at the Meeting of Creditors, other than what purport to be copies of: (a) a deed to the 10 Tall Pines Lane property dated February 2, 2005 from the Debtors to their son, Serafino Randazzo, together with a Real Estate Transfer Tax Return for the transaction; and (b) a deed to the 3 West Street property dated April 15, 2002.

204.    The Plaintiff duly filed a proof of claim for the Cambareri Claims in the Bankruptcy Case, the contents of which is incorporated herein by reference.

## AS AND FOR A FIRST CLAIM FOR RELIEF

205.    The Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "204" above as if fully set forth at length herein.

206.    The Debtors incurred the enormous debts giving rise to the Cambareri Claims by means of a continuous series of unlawful forgeries and actual fraud.

207.    By reason of the foregoing, the Cambareri Claims should be declared non-dischargeable under Section 523(a)(2)(A).

## AS AND FOR A SECOND CLAIM FOR RELIEF

208.    The Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "204" above as if fully set forth at length herein.

209.    All of the harm done to the Plaintiff and his property giving rise to the Cambareri Claims was the result of the Debtors' willful, malicious and criminally larcenous conduct.

210.    By reason of the foregoing, the Cambareri Claims should be declared non-dischargeable under Section 523(a)(4) and/or 523(a)(6).

## AS AND FOR A THIRD CLAIM FOR RELIEF

211.    The Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "204" above as if fully set forth at length herein.

212.    The Debtors' conduct as described above, and their transfer of their interest in the Ten Tall Pines Lane to their son within one year of the Filing Date, were all part of a systematic scheme and plan to strip away all of their assets, and to hide all

potential assets or means for payment of the debts owed to the Debtors' creditors, including the Plaintiff.

213. The Debtors' conduct as described above, and their transfer of their interest in the Ten Tall Pines Lane to their son within one year of the Filing Date, were done with the intent to hinder, delay or defraud the Debtors' creditors, including the Plaintiff.

214. Upon information and belief, by reason of the foregoing the Debtors should be denied a discharge under Section 727(a)(2)(A) of the Bankruptcy Code.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

215. The Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "204" above as if fully set forth at length herein.

216. The Debtors have concealed, destroyed, mutilated, falsified or failed to keep or preserve recorded information, including recorded information which would establish their felonious conduct underlying the Cambareri Claims.

217. By reason of the foregoing, the Debtors should be denied a discharge under Section 727(a)(3) of the Bankruptcy Code.

## AS AND FOR A FIFTH CLAIM FOR RELIEF

218. The Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "204" above as if fully set forth at length herein.

219. The Debtors' verified Schedules and Statement of Financial Affairs, and the Debtors' testimony at the Meeting of Creditors were false regarding many matters, including, *inter alia:* (a) the Debtors' Prior Bankruptcy Case; (b) the unscheduled transfers made to their children, including the transfer of the Ten Tall Pines property

made to their son in February 2005; (c) the value of the Jeep Grand Cherokee that Pietro was seen driving a few days prior to the Meeting of Creditors; (d) the value specified for the Mercedes automobile; (e) the value of the diamond ring owned by Nicolina Randazzo that was not listed in the Schedules; (f) transactions between the Debtors and creditors who were not identified or who were improperly identified in the Schedules and Statement of Financial Affairs; (g) the basis of the Cambareri Claims; and (h) the statement that the Additional Cambareri Claim was based on a personal loan.

220.    The Debtors' statements under oath during the Meetings of Creditors and the false information in the verified Schedules and Statement of Financial Affairs pertaining to the above described matters, were made and done knowingly and fraudulently.

221.    Upon information and belief, by reason of the foregoing the Debtors should be denied a discharge under Section 727(a)(4)(A) of the Bankruptcy Code.

## AS AND FOR A SIXTH CLAIM FOR RELIEF

222.    The Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "204" above as if fully set forth at length herein.

223.    At all material times mentioned herein  Nicolina Randazzo was, and still is an "insider" to her sister Vincenza Cambareri, as that term is defined in Section 101(31) of the Bankruptcy Code.

224.    At all material times mentioned herein Pietro Randazzo was, and still is an "insider" to his sister-in-law Vincenza Cambareri, as that term is defined in Section 101(31) of the Bankruptcy Code.

225.    The Debtors' submission of the Notice of Withdrawal of Vincenza's Chapter 13 Case" bearing a forgery of Vincenza's signature thereon was done within one year of the Filing Date.

226.    The foregoing conduct on the part of the Debtors constitutes the commission of an act specified in paragraph (4)(A) and (4)(C) of Section 727(a) of the Bankruptcy Code in connection with the Vincenza's Bankruptcy Case involving an insider of the Debtors, all within one year of the commencement of this Bankruptcy Case.

227.    Upon information and belief, by reason of the foregoing the Debtors should be denied a discharge under Section 727(a)(7) of the Bankruptcy Code.

WHEREFORE, the Plaintiff respectfully requests entry of an order and judgment in his favor:

(a)    Declaring the Cambareri Claims non-dischargeable;  and

(b)    Denying the Debtors' discharge; and

(c)    Granting the Plaintiff such other and further relief as the Court may deem just and proper.

Dated: Granite Springs, New York
       June 8, 2006

    /s/ William F. Macreery_____
WILLIAM F. MACREERY, ESQ. (WM9251)
Attorney for the Plaintiff-Carmelo Cambareri
7 Granite Springs Road
Granite Springs, New York 10527
(914) 248-0531